IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:17cr67 |
| | ) | |
| GREGORY KYLE SEERDEN | ) | |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S MOTION TO SUPPRESS**

COMES NOW the United States of America, by and through its attorneys, Dana J. Boente, United States Attorney for the Eastern District of Virginia, David A. Layne, Special Assistant United States Attorney, and Elizabeth M. Yusi, Assistant United States Attorney, in response to defendant Gregory Kyle Seerden's Motion to Suppress. As set forth below, agents of the Naval Criminal Investigative Service (NCIS) acted appropriately by seizing and searching defendant Seerden's cellular telephone, pursuant to valid command authorization supported by probable cause. Therefore, his suppression motion should be denied. In further support, the government avers the following:

**BACKGROUND**

On March 31, 2017, the United States obtained a criminal complaint charging Petty Officer First Class Gregory Kyle Seerden, United States Navy (Seerden) with one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(5)(A), and one count of production of child pornography, in violation of 18 U.S.C. § 2251. This complaint, based upon a finding of probable cause by United States Magistrate Judge Lawrence R. Leonard, stemmed from information found during a search of Seerden's iPhone 7, seized on January 27, 2017.

The investigation began in the early morning hours of January 27, 2017. NCIS received a report from a woman (F1)[1], who claimed that Seerden had sexually assaulted her in his hotel room aboard Joint Expeditionary Base Little Creek-Fort Story (JEBLCFS). F1 reported that she had spent the night of January 26, 2017, into January 27, 2017 with Seerden at various bars and restaurants in Virginia Beach. Specifically, she and Seerden met with a group of friends and went to several restaurants and bars. At some point, 'F1 began to black out due to alcohol consumption. F1 recalled returning to JEBLCFS with Seerden where she was required to produce her driver's license as identification before moving onto the installation. Eventually, they went to Seerden's room at the Navy Gateway Inns and Suites. F1 recalled Seerden on top of her in his bed. She also recalled telling Seerden to stop and Seerden smacking her on her legs and buttocks. At approximately 0400 on the morning of January 27, 2017, F1 woke up and Seerden informed her that they had engaged in sexual intercourse. F1 stated that she wanted to leave, and Seerden drove her to the JEBLCFS gate to hail a taxi. While F1 was just outside the gate, a sentry noticed her crying. F1 reported to the sentry what had transpired during the evening. F1 also pointed out that, just after dropping her at the gate, Seerden attempted to call her. Later in the morning, NCIS conducted a "pretext communication" between F1 and Seerden. The conversation took place via text-message. During the conversation, Seerden admitted to having sex with F1, without a condom, and that he knew she was not sober during the encounter. The two also discussed sex acts that they had engaged in the evening prior.

---

[1] For consistency and in the interest of the privacy of the alleged victim, the government will refer to her as the defense does as "F1."

Subsequent to the pretext communication and while Seerden was in classroom training on JEBLCFS, NCIS had Seerden come in for questioning. At the time, given the nature of the training course, Seerden was required to leave his cell phone outside the room. Per NCIS procedure, NCIS handcuffed Seerden for transportation to their facilities. Because Seerden was unable to retrieve his own belongings at the time, NCIS agents asked if he had any items he would like to bring along given that the classroom would likely be secured by the time he was done with his interview. Seerden indicated that he had a cell phone he would like to bring, and the agents accommodated this request by bringing Seerden's phone to the NCIS facility. Once the phone was in possession of NCIS, they pursued a Command Authorization for Search and Seizure (CASS) in order to search the phone for evidence related to the alleged sexual assault. NCIS consulted with Judge Advocates from both JEBLCFS, and Seerden's chain of command[2]. Ultimately, NCIS and the respective command judge advocates made the determination that Seerden's commanding officer was the appropriate authority to issue the CASS for his physical examination and the cell phone. The commanding officer for the installation provided authority to search Seerden's hotel room.

Once NCIS obtained search authorization, they brought the phone to the NCIS digital forensics lab. Acting on the authority provided in the CASS, the digital forensics examiner created an extraction of the phone and began to analyze its data. While conducting analysis, the examiner extracted stored photographs from the phone. During the extraction, thumbnail size icons of images were displayed on-screen. Included in these thumbnail-sized images were

---

[2] Seerden was temporarily stationed at JEBLCFS for training. However, his commanding officer was in San Diego where Seerden was stationed permanently.

several benign family photos of Seerden and relatives. Also included were depictions that the examiner, based on his experience and training in child exploitation investigations, suspected of being child pornography. Recognizing the scope of the initial CASS as relating specifically to an adult sexual assault, the forensic examiner ceased further examination and consulted with the lead case agent on how to proceed. On March 20, 2017, NCIS obtained a federal search warrant from U.S. District Court Magistrate Judge Robert Krask authorizing further examination of the phone for evidence related to child pornography. Acting on the new authority, the examiner resumed his analysis of the phone and identified approximately 78 images and four videos of suspected child pornography. These images and videos formed the basis of the aforementioned criminal complaint and arrest warrant issued by U.S. District Court Magistrate Judge Leonard, and ultimately a four-count indictment against Seerden, returned on April 20, 2017.

## **DISCUSSION**

Seerden challenges the search of his cell phone as unlawful under the Fourth Amendment. Specifically, he argues that the CASS permitting the search of his phone for evidence of a sexual assault was issued by improper authority and lacked probable cause. For the reasons specified below, Seerden's commanding officer had authority to permit a search of Seerden's personal cell phone and he based his authorization firmly on probable cause that the phone contained evidence of a sexual assault. In other words, the search in question was entirely reasonable under the Fourth Amendment as applied to servicemembers on military installations. In any event, law enforcement acted in good faith at every step of the investigation, making suppression of the cell phone an improper remedy in this case.

**A. THE FOURTH AMENDMENT APPLIES TO SERVICEMEMBERS, BUT WITH "DIFFERENT STANDARDS"**

The Fourth Circuit has recognized that the Fourth Amendment applies to members of the military and protects them from unreasonable searches and seizures. *United States v. Rendon*, 607 F.3d 982, 990 (4th Cir. 2010). However, that application comes with different standards than those that apply in a civilian context. *Id.* In recognizing that the military is a specialized society "governed by a separate discipline from that of the civilian," the Supreme Court has held that the reasonable expectation of privacy enjoyed by the civilian is necessarily reduced in the servicemember. *Parker v. Levy*, 417 U.S. 733, 745-58 (1974). In *Rendon*, a servicemember's MP3 player was inspected upon check-in to a new command at Fort Knox. 607 F.3d 982. The Fourth Circuit found that no reasonable expectation of privacy existed in the MP3 player under the circumstances of that case, likening the inspection to that of a border search, and pointing out the military interest in preventing the entry of contraband onto bases. *Id.* at 991.

Prior to *Rendon*, the Fourth Circuit decided *United States v. Jenkins*, which dealt with a civilian's Fourth Amendment rights aboard a military installation. 986 F.2d 76 (4th Cir. 1993). In *Jenkins*, a civilian entered Andrews Air Force Base and threatened to kill his ex-spouse. *Id.* at 77. As he attempted to flee the installation, base security apprehended him, and a search of his vehicle revealed a pistol and ammunition. *Id.* Finding that base police lacked probable cause to suspect Jenkins of attempted murder at the time of his arrest, the District Court suppressed the evidence of the vehicle search. *Id.* at 78. The government appealed the District Court's ruling on suppression.

In reversing the District Court, the Fourth Circuit suggested that searches on closed military bases are exempt from the "usual Fourth Amendment requirement of probable cause." *Id.* The Fourth Circuit reasoned that the need to protect a military installation presents security

5

concerns non-existent in a civilian locale. *Id.* Jenkins had no right of unrestricted access at the installation, and, moreover, the Court determined that he had impliedly consented to being searched by virtue of the totality of the circumstances (i.e., the installation was contained by a barbed-wire fence, warning signs indicating search authority, and common sense awareness of the nature of a military base). *Id.* at 79.

While *Jenkins* could be read to hold that an individual enjoys no Fourth Amendment protections while aboard a "closed" military installation, other circuits and district courts discussing *Jenkins* have refused to adopt such a bright-line rule. *See, e.g., Morgan v. United States*, 323 F. 3d 776, 782 (9th Cir. 2003)(drawing on *Jenkins* to hold that one may impliedly consent to a search on a military base); *United States v. Cross*, 2014 U.S. Dist. LEXIS 146617, *31 (E.D. Va. Oct. 14, 2014)(adopting from *Jenkins* a proposition that one's expectation of privacy is diminished, particularly at checkpoints aboard military installations, thus making certain searches reasonable under the Fourth Amendment); *United States v. Hitselberger*, 991 F. Supp. 2d 108, 118 (D.D.C. Mar. 5, 2014)(Noting that "[t]he Fourth Circuit came close to announcing a rule that 'searches on closed military bases' are 'exempt from the usual Fourth Amendment requirement of probable cause'," and that the Ninth Circuit rejected such a per se rule). Instead, what *Jenkins* and its progeny may more reasonably stand for is a proposition that the nature of a closed military installation is an important consideration when evaluating one's reasonable expectation of privacy on a military installation, and thus the overall reasonableness of any search conducted on such property.

The Supreme Court and the Fourth Circuit have made clear that servicemembers enjoy the protections of the Fourth Amendment. However, those protections are diminished by virtue

6

of the military's emphases on good order and discipline, security, and readiness. Seerden is a First-Class Petty Officer in the United States Navy. He works within a subset of the military for which good order and discipline is of enhanced importance. His job requires that he and his colleagues maintain readiness at all times in the interest of our nation's defense.

As part of that job, his unit sent him to JEBLCFS for training. JEBLCFS is an installation that is as "closed" as almost any other military installation. Civilian access to the base is strictly limited, signposts outside the entry gates indicate that persons who enter are subject to search, a barbed-wire fence surrounds the base, and Navy police and working dogs patrol regularly. The installation is the East-Coast home to several Naval Special Warfare units. While the installation provides daycare programs, a bingo night, and other recreational opportunities, from a security standpoint it is not functionally different from Andrews Air Force Base or Marine Corps Base Quantico. Those installations offer similar recreational programs and house large populations of military, civilian personnel, and dependents. Put another way, JEBLCFS is an installation for which protection is "vital to national security." *Jenkins*, 986 F.2d at 78; *Wysocki v. Brandenburg*, 2006 U.S. Dist. LEXIS 24783, *13-15 (E.D. Va. Apr. 26, 2006)(finding for defendants in a civil motion for summary judgment that a civilian's reasonable expectation of privacy was "punctured" under the same rationale as *Jenkins* while aboard JEBLCFS). Additionally, Seerden was a temporary visitor to JEBLCFS, miles from his permanent place of duty. Like the soldier subject to a check-in inspection in *Rendon*, Seerden could not expect the same expectation of privacy in his person or belongings as he would off-base or at his permanent duty station. The nature of JEBLCFS and Seerden's status in the

military provide the Court with the context in which to evaluate Seerden's suppression motion, which ultimately hinges on the reasonableness of the search in question.

### B. SEERDEN'S UNIT COMMANDER HAD THE AUTHORITY TO ISSUE THE SEARCH AUTHORIZATION FOR SEERDEN'S PHONE

A military commander's broad powers of search and seizure over persons and places falling under his or her command derives from long-standing military custom. *United States v. Stuckey*, 10 M.J. 347, 360 (C.M.A. 1981). This power is commensurate with the commander's unique responsibility for the personnel, property, and material that falls under their command. *United States v. Doyle*, 1952 CMA LEXIS 766, *4 (C.M.A. 1952). Such authority has been memorialized in Military Rule of Evidence 315(d), which provides: "A search authorization under this rule is valid only if issued by an impartial individual in one of the categories set forth in subdivisions (d)(1) and (d)(2)." Subdivision (d)(1) defines the category of "Commander" and states: "A commander…who has control over the place where the property or person to be searched is situated or found, or, if that place is not under military control, having control over persons subject to military law or the law of war[.]"

Seerden challenges the search of his phone, in part, using the argument that because the phone was technically seized from installation space, vice his person, the installation commander was the only authority from whom authorization to search could come. In other words, Seerden contends that his unit commander could *only* authorize a search of Seerden himself, or items physically on his person. While case law addressing this issue is lacking, several cases have upheld unit-level commanders authorizing searches of the sort that Seerden might find improper. *See, e.g., United States v. Huntzinger*, 69 M.J. 1, 6 (C.A.A.F. 2010)(unit-level commander, an Army Captain, authorizing search and seizure of unit member's media devices from a barracks

8

room on Forward Operating Base Loyalty, Iraq); *Rendon*, 607 F.3d 982 at 987 (unit-level authorization to inspect, and subsequent search by unit commander at Fort Knox was reasonable under Fourth Amendment); *United States v. Reppert*, 76 F. Supp. 2d 185 (D. Conn. 199)(commander of appellant's submarine unit issuing authorization to search appellant's off-base residence, and seize a computer inside, when the residence fell under military control due to lease provisions).

In *United States v. Mix*, the Court of Appeals for the Armed Forces (CAAF) addressed Mil. R. Evid. 315(d)(1). 35 M.J. 283, 287-88 (C.A.A.F. 1992). In *Mix*, CAAF approved a battalion commander's approval to search a subordinate's automobile in a common parking lot aboard an Army installation. *Id.* The parking lot on which the subject vehicle was located was a joint lot surrounding a dining facility used by three battalions. *Id.* at 288. CAAF gave only brief consideration to the issue of command authority, but concluded that under the facts of *Mix*, no less than four individuals had "control over the place where the automobile was located." *Id*. On the basis that his battalion used the dining facility and that the vehicle belonged to one of his unit-members, CAAF found that the battalion commander for the appellant could authorize the search of the appellant's car. *Id.* Alternatively, CAAF agreed with the decisions of the Army Court of Criminal Appeals, and the trial court, that the evidence was admissible under the good-faith exception as the battalion commander acted as a "rational, reasonable commander having probable cause to believe that he could authorize a search of appellant's car." *Id.* (citing *United States v. Lopez*, 35 M.J. 35 (C.M.A. 1992).

Here, Seerden's commanding officer had authority to issue the search in question. As Seerden's unit commander, he is charged with a unique responsibility to ensure the safety of unit

9

members, and good order and discipline within the unit. This responsibility of the commanding officer for his or her command is absolute. NAVY REGULATIONS, ARTICLE 0802. To take the perspective that a unit commander cannot authorize a search of property that his member brings upon a distant military installation would seem to relieve the commander of his responsibility over members of his unit. This is especially true in the Special Warfare community, where Seerden's commanding officer is one of relatively few individuals with an intimate understanding of Seerden's business aboard JEBLCFS, and what information he may have amongst his personal belongings. The CASS in question authorized the search of the cellphone itself, after it came into NCIS possession. If anyone had "control" over the cellphone, other than Seerden, it is his commanding officer because Seerden was the commanding officer's personnel who brought the device to JEBLCFS. To conclude that the unit-commanding officer has no authority to issue a search of unit member's belongings simply because he does not control the brick and mortar housing the item at a particular moment is contrary to the rationale underpinning the command authorized search and seizure.

### C. A TECHNICAL DEFICIENCY OF MRE 315(d)(1) DOES NOT WARRANT SUPPRESSION

In *United States v. Chapple*, 36 M.J. 410 (C.A.A.F. 1993), the CAAF was charged with determining whether the commanding officer of Naval Support Activity Naples could properly authorize a search of an overseas off-base apartment where neither the appellant, nor the owner of the apartment, fell under the' commanding officer's chain of command. 36 M.J. 410, 411 (C.A.A.F. 1993). In other words, CAAF was presented with a situation in which the authorizing commander ostensibly had no control over either the appellant *or* the physical place to be searched. At trial, the military judge found authority to authorize the search in the commander's

10

responsibility "as local coordinator" of a housing referral office, and "to investigate crimes and prepare investigation reports; maintain good order and discipline; [and] provide for the safety and security of personnel and property." *Id.* at 412-13. However, CAAF pointed out that the commanding officer's authority to authorize a search of the defendant must have been based on either his control over the appellant's apartment, or his command relationship with the appellant. *Id.* at 413. Accordingly, CAAF found authority lacking as the commander had no control over the apartment searched, nor was he in the appellant's chain of command. *Id.* Despite what could be seen as a *complete* lack of authority to issue the search in question, CAAF found that the *Leon* good-faith exception, further discussed *infra*, applied to the case and suppression unwarranted. *Id.* Reasoning that the commander had general authority to authorize searches, had consulted with Naval Investigative Service[3] agents and his staff judge advocate, and was operating on a genuine, but erroneous belief that he had the requisite authority, the fact that he did not have *actual* authority did not make the fruits of the search inadmissible. *Id.* (citing *United States v. Leon*, 468 U.S. 897, 916 (1984)).

In Seerden's case, even if the Court were to find that his commanding officer did not have the technical authority to issue this particular CASS, he certainly enjoyed far more authority to do so than the installation commander in *Chapple*. Seerden and his commanding officer obviously have a superior-subordinate relationship by virtue of their military chain of command. Seerden's commanding officer issued the CASS in question after consultation with NCIS agents and his staff judge advocate. The parties involved discussed the matter and ultimately concluded that it was best to allow Seerden's commanding officer to authorize the

---

[3] The Naval Investigative Service is the former name of what is known now as NCIS.

search of Seerden's person and his cell phone, while JEBLCFS would authorize the search of the hotel room in which the alleged sexual assault took place. By virtue of his control over Seerden as the unit commanding officer, Seerden's commanding officer had "control" over the item to be searched. In the alternative, because the commanding officer and law enforcement acted on a good-faith belief that he had the requisite authority, in consultation with his staff judge advocate and NCIS, the good-faith exception applies

### D. THE COMMAND AUTHORIZATION TO SEARCH SEERDEN'S CELL PHONE WAS SUPPORTED BY PROBABLE CAUSE

A command authorization for search and seizure is not a warrant, and many of the traditional requirements of the Fourth Amendment's warrant clause do not apply to a military CASS. *Stuckey*, 10 M.J. 347 at 360. Nevertheless, a CASS must be supported by probable cause. MIL. R. EVID. 315(f). MRE 315(f), promulgated by the President under authority conferred through the Uniform Code of Military Justice, defines probable cause as existing "when there is reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched." MIL. R. EVID. 315(f)(2). Reviewing an affidavit of probable cause must be done in a commonsense, rather than hypertechnical, manner. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). Rather than apply a rigid formula or test, courts must instead simply consider whether "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

Seerden cites several cases in which probable cause to search was lacking. However, these cases are all distinguishable from the instant matter. For example, in *United States v. Shanklin*, there was no nexus or suggestion whatsoever that the defendant's media devices were

connected to the crime charged. 2013 U.S. Dist. LEXIS 161947, *22 (E.D. Va. Nov. 13, 2013). The victim did not mention the defendant's media devices and the only connection between those devices and the crime charged was the affiant's claims of offender typology. *Id.* at *23. Similarly, in *United States v. Thomas*, evidence of a sexual battery allegation alone was insufficient to find probable cause linking the crime to defendant's cell phone. 2016 U.S. Dist. LEXIS 174244 *3 (W.D. Va. Dec. 15, 2016). Importantly, in *Thomas*, the evidence was admitted under the *Leon* good-faith exception. *Id.*

In *United States v. Church*, the district court found that no probable cause existed to seize a defendant's tablet and laptop for child pornography. *United States v. Church*, 2016 U.S. Dist. LEXIS 144422, *14 (E.D. Va. Oct. 17, 2016). On the other hand, and more akin to this case, probable cause was found to exist to seize the Church's cellphone for evidence related to forcible sodomy, based on a text-message conversation revealed by the victim. *Id.*

Finally, through *Commonwealth v. White*, Seerden relies on a situation in which no nexus existed at all linking the defendant's cellphone to the crime being investigated. 475 Mass. 583, 590-92 (Mass. Sept. 28, 2016). In that case, no warrant was sought to seize the phone in question. *Id.* at 586. Instead, officers merely seized the device, only to pursue a warrant to search several months later. *Id.* at 587.

Seerden's factual situation is most akin to that found in *United States v. Will*. 2015 U.S. Dist. LEXIS 79887 *1 (N.D. W. Va. June 19, 2015). In *Will*, the defendant was charged in a one-count indictment with possession of child pornography. The defendant attacked the validity of the search warrant that led to the discovery of the contraband on the ground that law enforcement lacked a sufficient nexus between the charged crime of misdemeanor battery and

13

the search of his home for media devices. *Id.* at *10-11. The Court found that probable cause existed to seize Will's computer because he had used social media to contact the victim. Thus, "information from the defendant's computers was relevant to the prosecution for battery." *Id.* at *11-13.

In Seerden's case, law enforcement and Seerden's commanding officer had the requisite nexus to conclude that evidence of an adult sexual assault would be found on Seerden's cellphone. Under the same logic as *Will*, the pretext conversation between Seerden and F1 is enough to justify a finding of probable cause to search the phone. However, the commanding officer had more than one text conversation from which to conclude that probable cause existed. Seerden attempted to call F1 after dropping her at the entrance to JEBLCFS. Moreover, applying a commonsense approach to the CASS affidavit, it is also reasonable to believe, that based on those communications, Seerden and F1 had exchanged phone numbers sometime during the evening of the alleged assault. It is similarly appropriate for the commanding officer to have believed, based on the facts contained in the affidavit that Seerden had his cellphone on his person throughout an evening in which he visited three bars with F1, with a group of friends, ultimately returning to JEBLCFS. Given the nature of modern cellphones, it would be reasonable for law enforcement, and Seerden's commanding officer to infer that Seerden took pictures while out with the group, or received other pieces of evidence to his cellphone that could corroborate F1's version of events, or exculpate Seerden. *See United States v. Nieto*, 76 M.J. 101, 106 (C.A.A.F. 2017)("a nexus may 'be inferred from the facts and circumstances of a particular case, including the type of crime, the nature of the items sought, and reasonable inferences about where evidence is likely to be kept'.")(quoting *United States v. Clayton*, 68 M.J.

14

419, 424 (C.A.A.F. 2010). This is not a situation in which the only connection between a device seized and a crime alleged is an officer's understanding of offender typology or speculation.

### E. THE GOOD-FAITH EXCEPTION APPLIES

"Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if 'the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (quoting *Leon*, 468 U.S. at 926). The Supreme Court fashioned the good-faith exception with the understanding that the purpose of the exclusionary rule is to deter police misconduct. *United States v. Andrews*, 577 F.3d 231, 235-36 (4th Cir. 2009). This purpose "is not achieved through the suppression of evidence obtained by an 'officer acting with objective good faith' within the scope of a search warrant issued by a magistrate'." *Id.* at 235 (internal citations omitted). Accordingly, *Leon* stands for a proposition that a court should not "suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization'." *United States v. Bynum*, 293, F.3d 192, 195 (4th Cir. 2002)(quoting *Leon*, 468 U.S. at 922 n. 23). Indeed, "the exclusionary rule is not a constitutional right, but a judicially created remedy." *United States v. Fogg*, 52 M.J. 144, 151 (C.A.A.F. 1999). The exception is codified in the Military Rules of Evidence. MIL. R. EVID. 311(c)(3). Despite some difference in the language used, Mil. R. Evid. 311(c)(3) is applied the same as the civilian rule described in *Leon*. *United States v. Carter*, 54 M.J. 414, 421-22 (C.A.A.F. 2001).

The Supreme Court identified four situations in which the good faith exception would not apply. They are:

(1) if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;

(2) if "the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo—Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979)";

(3) if the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and

(4) if under the circumstances of the case the warrant is "so facially deficient— i.e., in failing to particularize the place to be searched or the things to be seized— that the executing officers cannot reasonably presume it to be valid."

*United States v. DeQuasie*, 373 F.3d 509, 519-20 (4th Cir. 2004) (quoting Leon, 468 U.S. at 923). Since *Leon*, Courts have regularly applied the good faith exception to search warrants deficient in probable cause. *See, e.g., Thomas*, 2016 U.S. Dist. LEXIS 174244 at *3; *Will*, 2015 U.S. Dist. LEXIS 79887 at *1 (stating that even if the warrant lacked probable cause, the good faith exception would save the evidence from exclusion.); *United States v. Graham*, 796 F.3d 332, 361-62 (4th Cir. 2015)(government entitled to good faith exception despite warrants lacking probable cause where law enforcement followed procedures of the Stored Communications Act and relied on two court orders issued by magistrates); *Chapple*, 36 M.J. 410 at 413-14 (Navy captain authorizing search for which he had no authority, but believed he did based on advice of staff judge advocate, and assistance from NIS agents).

Should the Court find the CASS in this case unsupported by probable cause, suppression would nevertheless be inappropriate. Law enforcement in objective good faith at every step of this investigation. When Seerden's phone was first obtained by NCIS, it was taken by agents in the interest of convenience to Seerden. Once at the NCIS facility, agents began the process of pursuing search authorization. They conferred with installation officials and Seerden's command, to include the staff judge advocate. No search of the device was conducted until authority was granted. To a reasonably trained law enforcement official, the affidavit laid out probable cause to believe that within the cellphone, there was evidence connecting Seerden to the sexual assault of F1. The authorization laid out the specific parameters of the search, and authorized the search of text messages and saved images. Once the digital forensics examiner noticed evidence of a child pornography offense, he ceased the search to pursue additional authority. In sum, even if in hindsight the CASS is deemed deficient, suppression is an improper remedy.

## **CONCLUSION**

For all the reasons set forth below, the United States respectfully requests that the Court deny the defendant's motion to suppress and submits that no evidentiary hearing is required.

                Respectfully submitted,

                Dana J. Boente
                United States Attorney

By:    _____/s/_____
                David A. Layne
                Special Assistant United States Attorney
                Colorado State Bar No. 47989
                Attorney for the United States
                United States Attorney's Office
                World Trade Center, Suite 8000
                101 W. Main Street
                Norfolk, Virginia 23510
                Office Number - 757-441-3221
                E-Mail Address – david.layne@usdoj.gov

                Elizabeth M. Yusi
                Assistant United States Attorney
                Attorney for the United States
                United States Attorney's Office
                101 West Main Street, Suite 8000
                Norfolk, Virginia 23510
                Phone: (757) 441-6331
                Fax: (757) 441-6678
                Email: elizabeth.yusi@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of June, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic notification of such filing to the following:

Andrew W. Grindrod
VSB # 83943
Assistant Federal Public Defender
Attorney for Gregory Seerden
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0800
(757) 457-0880 (telefax)
andrew_grindrod@fd.org

Keith L. Kimball
Supervisory Assistant Public Defender
Attorney for Gregory Seerden
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0800
(757) 457-0880 (telefax)
Keith_Kimball@fd.org

_____/s/_____
David A. Layne
Special Assistant United States Attorney
Colorado State Bar No. 47989
United States Attorney's Office
World Trade Center, Suite 8000
101 W. Main Street
Norfolk, Virginia 23510
Office Number - 757-441-3221
E-Mail Address – david.layne@usdoj.gov